**RIDGEWAY et al. v. WARREN.**

Civil Action No. 28.

District Court, M. D. Tennessee, Columbia Division.

May 7, 1945.

Noble L. Freeman, of Lawrenceburg, Tenn., for plaintiffs.

John J. Hooker, of Nashville, Tenn., E. W. Eggleston, of Franklin, Tenn., and Foster F. Locke, of Lawrenceburg, Tenn., for defendant.

DAVIES, District Judge.

The cause was submitted upon the pleadings, evidence, exhibits, and argument of counsel for plaintiffs and defendant, and, after due consideration thereof, the Court enters its findings of fact and conclusions of law, as follows:

## Findings of Fact.

1. The defendant H. H. Warren is the owner and operator of a large farm comprising approximately fifteen hundred acres located near Appleton, in Lawrence County, Tennessee. In conjunction with his farming operations, he has operated a general retail country store, a cotton gin, and a sawmill. In October, 1938, he was engaged in clearing and putting into cultivation a considerable part of the land which he owned. On some portions of the land there was a good stand of timber, and defendant had the timber cut and manufactured into lumber at the small sawmill located on his property, which began fairly regular operations during the month of October, 1938, cutting about seven or eight thousand board feet of lumber a day.

2. Most of the plaintiffs in this cause began working for the defendant about the time these operations began, or shortly thereafter. They were all employed by defendant, and were paid by him at the rate of $1 per day either in cash or in merchandise from his general store. Some were employed in the capacity of cutting timber, others hauling logs, and others working at the mill and hauling lumber. The ordinary day's work was ten hours. The defendant sold the lumber manufactured by him to various individuals and lumber dealers, and knew that the larger part of the lumber manufactured by him was intended for shipment or distribution in other states.

3. At the beginning of the timber cutting operations by the defendant, he did not purchase timber from other parties except possibly in one or two minor instances, one of which took place before the Fair Labor Standards Act became effective, but was engaged mainly in cutting and manufacturing into lumber the timber which he had been clearing from his own property so as to make the land available for agricultural purposes. It appears that defendant fattened and sold a large number of live stock every year and harvested approximately two thousand bales of cotton during the year 1941, so that he was extensively engaged in farming operations, and it is readily deductible from the evidence in this cause that during the first part of his timber operations, this activity was mainly incidental to his agricultural and farming operations so that the land cleared by the removal of the timber could be put to agricultural uses.

4. This situation existed until approximately the first of July, 1939, at which time the sawmill and timber operations changed its entire aspect. The defendant has a brother, Mason Warren, who appears to be a sort of ne'er-do-well, and for a number of years has been a responsibility of the defendant's. Mason Warren had been away from the village of Appleton, the home of defendant, for several years and returned there in 1937 and went to work for the defendant. After the defendant began his timber operations, he employed Mason to superintend the cutting of timber and the hauling of logs to the mill and paid him on the basis of a day laborer, as were the plaintiffs in this cause.

5. In July, 1939, the defendant attempted to transfer the timber and lumber business to his brother, Mason. There was no consideration for the transfer and the purpose of it seems to have been most indefinite. The defendant says he wanted to get his brother started and that his brother had been after him to let him run the sawmill, so he told him to go ahead and that he could have the use of the mill. The brother, Mason, had no capital and it was necessary for the defendant to finance the operations of the mill. This was purportedly done by the defendant opening on his books an account in the name of Mason Warren. The employees were not notified by the defendant of any change in the ownership of the business and continued to be paid by the defendant, either in cash or merchandise at the defendant's store, until operations of the mill ceased in the latter part of 1940. Up to that time, none of the employees had been told that they were working for Mason instead of the defendant, and all of them continued under the belief that they were working for the defendant, who appeared to be generally in charge of hiring and firing employees, giving directions as to length in which logs were to be cut, selling lumber and directing the operations of the mill.

6. The purchase of timber from other persons began shortly after July, 1939, and although Mason Warren claims to have purchased all timber from that date for his own account, and in this he is supported by most all of the witnesses who sold the timber, invariably in every case, while the trade was made by Mason, the timber was paid for by the check of the defendant. In all cases where manufactured lumber was

365

sold, the purchaser understood he was buying the lumber from the defendant and check in payment therefor was made payable to the defendant and cashed by him. The defendant insists that all of these items were either credited or charged to the account that he had opened on his books with his brother, Mason. However, it appears that the mill was owned by the defendant; the machinery and equipment owned by him; the stock and wagons and trucks were owned by him, and no charge seems to have been made against Mason's account for the use of these items, except in some instances of the hauling of lumber and logs by truck. It appears that Mason was financially and morally irresponsible, had no property whatever, and made no investment in the operations. During the period of the operations, timber was purchased in the states of Tennessee and Alabama and the manufactured lumber sold in interstate commerce.

7. Defendant insists that he had no interest in the operations in question after July, 1939, and that the business belonged entirely to his brother. The only evidence which he has to corroborate him in this insistence, in addition to his own and his brother's testimony, is the book account which has been exhibited. All these were matters about which plaintiffs had no knowledge whatsoever, and all were employed by the defendant and all understood they were working for him. On account of Mason's lack of financial responsibility, it is extremely doubtful that any of the plaintiffs would have performed their work, had they been under the impression they were working for him. The evidence in this cause was presented at different intervals, and after the case had been closed and was under consideration by the Court, the plaintiffs filed a petition in the cause setting up certain contradictory statements made by Mason Warren to two of the plaintiffs and their counsel, and upon the showing made thereon, the Court remanded the cause and reopened the case for further evidence in this connection. Up to that time, the case had given the Court a great deal of worry and concern. The Court was not impressed on the first trial of the cause with the testimony of the witness Mason Warren, but there was nothing definite in his testimony that the Court felt would justify entirely disregarding it. However, after the case was reopened, it appeared from the evidence that after the trial of the cause said Mason Warren sent a postal card to the plaintiff Dave Anders asking him to come to Appleton and talk to him, and upon Anders', in company with the plaintiff Hollandsworth, calling on Mason Warren, they both testified that Mason wanted to know if he could join up with them and draw his part of the money like they expected to do, as he was only working for a salary like they were, and that he had worked for a while as a partner, but the defendant cut him off and put him on a salary just like the rest of the men, and that he was willing to tell the true situation if he could get his part of the pay. The plaintiff Anders is corroborated in this statement by the plaintiff Hollandsworth, and although it is denied by Mason Warren that he had made any such statement, there is no question but that he did send the card, as it was produced in court, and he could not or would not give any satisfactory explanation as to why it was mailed, and upon the Court questioning the other witnesses particularly as to any possible circumstances which might have caused the card in question to be sent, the Court is unable to find any reasonable excuse for it having been sent, other than the facts testified to by Anders and Hollandsworth. The witness Mason Warren, not only at the original trial of the cause, but particularly, at the hearing after the case was reopened, in testifying was evasive, contradictory, reluctant to make any statement, and apparently so untruthful as to justify the Court placing no credence whatsoever in his testimony. Furthermore, the Court was never at any time very favorably impressed with the straightforwardness of the defendant as a witness.

8. The Court, under all the circumstances, is, therefore, constrained to find that in the timber and sawmill operations after July, 1939, the witness Mason Warren was nothing more than a figure-head; that the business belonged entirely to the defendant; that he was operating it; and that he concealed from the plaintiffs the defense upon which he now relies, and allowed them to continue working under the belief that they were working for him; that he never, at any time, told anyone the operation in question was that of his brother, Mason Warren; that the whole plan was nothing more than a scheme or subterfuge to avoid the responsibilities of the Fair Labor Standards Act, to defraud the plain-

tiffs of their just wages and compel them to work at the slave wage of one dollar for a ten-hour work day.

9. The plaintiff Floyd Morrison testified in open court that for his part he wished to have this suit dismissed; that in the beginning, he made an agreement with the defendant to work for him for a certain amount and that he was satisfied with it.

### Conclusions of Law.

1. The court has jurisdiction of this cause. Section 216, Title 29 U.S.C.A.

2. During the period of time from October, 1938, the date the Fair Labor Standards Act became effective, to July, 1939, the timber operations carried on by the defendant, including the cutting of trees and the manufacture of lumber therefrom, were incidental to the clearing of land owned by defendant in conjunction with his farming operations, and were primarily for the benefit of clearing land for agricultural purposes, and, therefore, plaintiffs in this cause who were working for the defendant during said period of time were employed in agriculture, and fall within subsection (a)(6), Section 213, 29 U.S.C.A. so that they do not come within the provisions of Sections 206 and 207 of the Act.

3. The plaintiffs employed by the defendant during the period beginning July 29, 1939, down to the time defendant ceased operations of his mill in the latter part of 1940, were engaged in commerce or in the production of goods for commerce.

4. The defendant was the real owner and operator of the timber and sawmill operations from July 29, 1939, to the latter part of December, 1940, and he not only employed plaintiffs, but suffered and permitted them to work in said operations, and plaintiffs, except as hereinafter noted, are entitled to a judgment against the defendant for wages at the minimum rate and for overtime as provided by the terms and provisions of the Fair Labor Standards Act, plus an additional equal amount as liquidated damages, and an attorney's fee in an amount to be fixed by the Court when the amount due the plaintiffs is definitely determined.

5. The suit of Floyd Morrison is dismissed, and judgment will be rendered for the defendant as to his suit and for his proportionate costs.

6. In the event counsel are unable to agree as to the amounts due the various plaintiffs, a reference will be had to a special master to determine the amount for which each plaintiff is entitled to judgment, the costs of the reference to be taxed as a part of the costs of this cause.

7. The plaintiffs will also have and recover of the defendant the costs of this cause, for which execution may issue.

Judgment accordingly.